**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**PLANTERS BANK & TRUST COMPANY; AND**                    **PLAINTIFFS**
**PEOPLES BANCSHARES, INC. D/B/A PEOPLES BANK**

**VS.**                    **CIVIL ACTION NO.**  3:21-cv-381-KHJ-MTP

**ORIGIN BANK F/K/A COMMUNITY TRUST BANK**                    **DEFENDANT**

---

**VERIFIED COMPLAINT**

---

Plaintiffs Planters Bank & Trust Company and Peoples Bancshares, Inc. d/b/a Peoples Bank file this Verified Complaint against Defendant Origin Bank f/k/a Community Trust Bank, as follows:

**INTRODUCTION**

1.      After extending an almost $19 million construction loan, Origin Bank sold 95% of its interest in the loan to five other banks, including Plaintiffs. Origin retained a mere 5% interest but retained the right to administer and enforce the loan should the borrower default. But under its participation agreements with the purchasing banks (that is, the "participating" banks), Origin agreed to hold those rights for the participating banks' pro rata benefit. To waive enforcement of any covenants under the loan, Origin was also required to notify the participating banks and obtain approval from those banks holding 75% of outstanding principal. And should the borrower default, Origin obligated itself to enforce the loan with ordinary care.

2.      But the borrower defaulted soon after Origin extended the loan. And despite its obligations to the participating banks, Origin: (a) waived enforcement of the loan's debt-service-coverage ratio (for three years) without notifying the participating banks or obtaining their consent; (b) failed to monitor the property taxes for the underlying collateral, which the borrower failed to

pay for the 2018, 2019, and 2020 tax years, resulting the sale of the real-property collateral at two tax sales; and (c) delayed enforcing the loan after default. After discovering that Origin had waived the loan's covenants and failed to monitor the taxes, the participating banks pleaded and demanded that Origin take prompt action, particularly against the solvent guarantors who had the ability to right-size the loan, pay past due taxes, and otherwise bring real money to the table. Instead, Origin delayed and rebuffed the participating banks concerns. Worse, Origin's actions (and, more often, inaction) at all times favored the borrower and solvent guarantors at the participating banks' expense. Instead of aggressively enforcing the loan or pursuing the guarantors, Origin has given the borrower and guarantors carte blanche to attempt to sell the underlying project (a futile exercise) presumably so the guarantors will avoid financial liability. And after the participating banks began questioning Origin's motivations, Origin's chosen counsel that was enforcing the loan for the participants' benefit began representing Origin's interests *against* the participants—a conflict that persists to this date. Just last week, after the participating bank's demanded that independent counsel take over the collection efforts, Origin's chief risk officer emailed the participating banks and their counsel, threatening and touting its current counsel's recent election to Chairman of the Mississippi Board of Banking Review—an agency that regulates and oversees the participating banks that Origin's counsel is supposed to be benefitting. Based on Origin's behavior, the participating banks have lost faith in Origin and its counsel's ability to enforce the loan for the banks' benefit and can only conclude that Origin has some hidden motivation for delaying enforcement, evidenced by Origin's apparent pattern of collusion with borrower and guarantors.

3.     Plaintiffs now file this suit against Origin for breaching the participation agreements. But more pressing is the immediate need to remove Origin as the lead bank under

those agreements and to allow Origin *and* the participating banks to jointly select independent counsel to enforce the loan in the best interests of all. Until that is done, Plaintiffs will continue to suffer immediate and irreparable harm while this suit is pending. Most important, among other things, Plaintiffs are regulated entities with a large problem loan on their books. This substandard loan requires reporting to bank examiners, subjects Plaintiffs to regulatory restriction and scrutiny, and affects Plaintiffs ability to extend credit to other customers. And Origin's preference to grant the borrower near unlimited time to sell the project (presumably to protect the guarantors and their assets from financial liability and a monetary judgment) instead of aggressively enforcing the loan is making matters worse each day. Unless and until enforcement is taken seriously, the participating banks will continue to suffer this and other irreparable harm.

4.      To be clear, this is not simply a dispute over the strategies and tactics that Origin has chosen in enforcing the loan. Instead, this case is about Origin's intentional and willful decisions to favor the borrower and guarantors over the participating banks at all times, including, as set forth below, by concealing critical information and agreements between Origin and the borrower and guarantors to this date. This conduct amounts to bad faith, warranting the extreme remedy of injunctive relief to prevent continued irreparable harm to the participating banks. Accordingly, in addition to the other causes of action set out below, the Court should also enter a temporary restraining order and preliminary injunction removing Origin as the lead bank and allowing Origin and the participants to jointly select independent counsel to enforce the loan documents.

## PARTIES

5.     Plaintiff Planters Bank & Trust Company ("Planters Bank") is a Mississippi banking corporation with its principal place of business in Indianola, Mississippi. As such it is a citizen of the State of Mississippi.

6.     Plaintiff Peoples Bancshares, Inc. d/b/a Peoples Bank ("Peoples Bank") is a Mississippi banking corporation with its principal place of business in Mendenhall, Mississippi. As such it is a citizen of the State of Mississippi.

7.     Defendant Origin Bank f/k/a Community Trust Bank ("Origin" or "Origin Bank") is a Louisiana banking corporation with its principal place of business there and, thus, a citizen of the State of Louisiana, which may be served with process by serving Craig N. Landrum, its registered agent for service of process in Mississippi, at 190 East Capitol Street, Suite 800, Jackson, MS 39205.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction over the subject matter and parties under 28 U.S.C. § 1332(a)(1). As set forth below, the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and cost and is between citizens of different states.

9.     Venue is proper under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims occurred in this district and division.

10.     Venue is also proper because the parties' written agreements at issue contain forum-selection clauses, under which the parties agreed to venue in this district and division.

## FACTS

**A.      Origin Bank extends a construction loan for the Haven on 12 project.**

11.      On June 16, 2014, Origin extended a construction loan to Haven Campus Communities – Starkville, LLC (the "Borrower") in the original principal amount of $18,615,081.00 (the "Loan"). The Loan is evidenced by a Construction Loan Agreement and Promissory Note that the Borrower executed in Origin's favor.

12.      The purpose of the Loan was to finance the construction and operation of a student apartment complex in Starkville, Mississippi, known as the Haven on 12, Starkville, Mississippi project (the "Project").

13.      To secure the Loan, the Borrower executed a Construction Deed of Trust, Assignment of Leases and Rents, and Security Agreement in Origin's favor, which covered, among other things, the Project's real property and granted Origin a security interest in the Borrower's leases and rents. The Borrower also executed a separate Assignment of Leases and Rents in Origin's favor.

14.      In addition, Stephen H. Whisenant, John A. Williams, Jr., Watkins J. Blaine, Jr., and Mark Boutwell (together, the "Guarantors") executed a Guaranty Agreement in Origin's favor, unconditionally guaranteeing the full repayment of the Loan.

15.      Origin has advised that certain of the Guarantors provided financial statements showing substantial net worth and liquidity.

**B.      Origin Bank sells participation interests in the Loan.**

16.      Origin thereafter sold participation interests in the Loan to five participating banks, totaling ninety-five percent: (a) Planters Bank purchased a 19% interest; (b) Peoples Bank purchased a 14% interest; (c) BOM Bank purchased a 12% interest; (d) First Bank purchased a

28% interest; and (e) SouthPoint Bank purchased a 22% interest (together, the "Participating Banks" or "Participants").

17.     To do so, Origin and the Participants each executed written participation agreements, under which Origin took the role as "lead bank." The participation agreements executed by Planters Bank and Peoples Bank, attached as Exhibits A and B, respectively, are similar and include the following provisions:

a.  Origin retained the right and responsibility to enforce the Loan Documents against the Borrower and Guarantors "for the pro rata benefits of [Origin] and [the Participants]." *See* Participation Agreements at § 9.

b.  Origin promised to "exercise the same care in administering the Loan Documents as it exercises with respect to similar transactions entered into solely for its own account . . . ." *Id*. at § 12.

c.  In administering the Loan Documents before default, Origin "shall otherwise have no liability or responsibility to [the Participants], except for actions taken or omitted to be taken by [Origin] which constitute willful misconduct or gross negligence . . . ." *Id*.

d.  But "[a]fter default by Borrower under the Loan Documents . . . [Origin] agree[d] to exercise the same duty of care in connection with the enforcement of [Origin]'s rights under the Loan Documents as would reasonably be expected of lenders which are similarly situated to [Origin] in connection with similar loans." *Id*.

e.  In addition, Origin many enter into loan modifications or waive compliance with the terms of the Loan Documents so long as it receives the consent of the Participants holding 75% of the Loan's principal balance. This includes Origin

taking or omitting to take any action under the Loan Documents that would result in "waiv[ing] compliance with Borrower's financial covenants set forth in the Loan [Documents]." *Id.* at § 14.

    f.   All of Origin's rights and obligations are subject to an overarching duty to act in good faith towards the Participants. *Id.*

## C.   The Borrowers and Guarantors default.

18.     The Borrower constructed the Project and began renting units.

19.     But starting in at least 2017, the Project began incurring shortfalls in the 1.2 Debt Service Coverage ("DSC") Ratio requirement under the Loan Documents.[1] On November 30, 2017, the DSC ratio was such that Origin required the Borrower to reduce the principal amount of the Loan by $870,402.82. Origin demanded that the Borrower do so, but it took the Borrower until March 6, 2018 to make any payment. Still, the Borrower reduced the principal amount to only $17,083,933.58. Origin took no other action.

20.     In 2018, the DSC ratio still failed to meet the requirements under the Loan Documents. But despite demands by the Participants, Origin willfully and with no regard toward the rights of the Participants never demanded that the Borrower reduce the principal, and the Borrower never did so.

21.     In 2019, Origin again willfully and with no regard towards the rights of the Participants failed to calculate or demand any principal reduction from the Borrower to meet the DSC ratio.

---

[1] The Construction Agreement, Promissory Note, Guaranty Agreement, Assignment of Leases and Rents, and Construction Deed of Trust, Assignment of Leases and Rents are referred to together as the "Loan Documents."

22.     Importantly, Origin Bank never consulted with the Participants regarding Origin's waiver of the DSC ratio requirements under the Loan Documents, and Origin certainly never obtained the necessary approval of Participants holding 75% of the outstanding principal balance to waive those defaults.

23.     In addition, the Borrower further breached and defaulted under the Loan Documents by failing to pay real property taxes for the 2018, 2019, and 2020 tax years. And the real property was sold *twice* at tax sales for the years 2018 and 2019. The cost to redeem the real property from those two sales and to pay the 2020 taxes before the real property is sold again totals approximately $1.3 million.

24.     Origin willfully and recklessly failed to keep up with the status of the real property taxes, despite its obligation to do so. Worse, Origin failed to thereafter alert the Participants that the taxes were unpaid and that the real property had been sold twice.

25.     Origin had the ability under the Loan Documents to escrow payments to pay real property taxes but failed to do so. And Origin willfully and recklessly failed to force the Borrower or Guarantors to pay the taxes once past due and the property was sold (twice).

**D.     Origin Bank fails to seriously enforce the Loan Documents.**

26.     During this time, Origin kept the Participants in the dark, willfully and recklessly failing to provide information and failing to request the Participants' approval of Origin's decision to waive the DSC requirements. Origin willfully and recklessly failed to even advise that the Borrower had failed to pay property taxes, resulting in the sale of the property (twice).

27.     Nonetheless, and with the maturity date of November 30, 2020 looming, the Borrower and Guarantors remained in default with the indebtedness growing each day, further increasing the undersecured status of the Loan.

28.     Frustrated, the Participants pursued various avenues of recourse, including repeated demands that Origin repurchase the participation interests, pursue litigation against the Guarantors, and enforce the security interests in the Loan Documents against the collateral.

29.     For example, on October 28, 2020, SouthPoint Bank notified Origin by letter that Origin was in breach of the participation agreements, demanding that Origin repurchase SouthPoint Bank's interest. *See* Letter of October 28, 2020, attached as Exhibit C. On October 30, 2020, Peoples Bank wrote Origin the same. *See* Letter of October 30, 2020, attached as Exhibit D. Origin responded to both on November 12, 2020, denying that it had breached the participation agreements and refusing to repurchase the participation interests. *See* Letter of November 12, 2020, attached as Exhibit E.

30.     During this time, Origin had been negotiating a potential restructure of the Loan with the Borrower and Guarantors. This included the Borrower and Guarantors' proposal that Origin agree to the Borrower selling the Project for less than the amount of the secured debt and a restructure of the remaining balance on an unsecured basis. Specifically, the Borrower and Guarantors requested that Origin advance additional funds to cover the unpaid taxes and to cover any deficiency in the sale price with the guaranties serving as the sole security for the remaining debt, which was estimated to be around $2.5 to $3 million. Origin was apparently agreeable to this unreasonable proposal and, in November 2020, finally revealed the proposal to the Participants and recommended they approve it.

31.     The Participants refused the one-sided, risky proposal. Instead, the Participants advised that they would agree only to a short forbearance through March 2021 to give the Borrower more time to market the Project, conditioned on the Borrower and Guarantors—and not Origin or

the Participants—paying the back taxes and reducing the principal to put it in line with the DCS ratio. But the Borrower and Guarantors refused.

32.     The Loan matured during this time on November 30, 2020, and it remains in default.

33.     The Participants demanded that Origin take immediate action to file suit on the guaranties and enforce the assignment of rents. Because the Origin had advised that certain Guarantors had substantial net worth and liquidity, action against the Guarantors—as opposed to the Borrower—was necessary to pressure them to satisfy the unpaid taxes, reduce principal, and offer a realistic proposal without forcing the Borrower, a single-purpose entity, into bankruptcy, which would only delay any resolution.

34.     Origin finally filed suit in this Court on January 29, 2021.[2] But contrary to the Participants' requests, Origin did so against both the *Borrower* and Guarantors. Origin also took no immediate action to enforce the assignment of rents—other than sending a demand letter to the Borrower dated January 29, 2021, which was entirely ignored.

35.     The Borrower and Guarantors answered Origin's complaint on March 2, 2021, admitting that the Loan had matured and was in default. But Origin took no immediate action.

36.     By letter of March 31, 2021, Peoples Bank's counsel wrote Origin's counsel to express dissatisfaction in the slow pace and ineffectiveness of Origin's collection efforts. *See* Letter of March 31, 2021, attached as Exhibit F. Specifically, Peoples Bank noted (a) that nothing of substance had occurred concerning the assignment of rents, other than the mailing of a demand letter that was entirely ignored; (b) that no credible reasons existed for Origin's failure to

---

[2] That suit is styled as *Origin Bank v. Haven Campus Communities – Starkville, LLC, et al.*, 3:21-cv-00061 (S.D. Miss.)

immediately pursue summary judgment in light of the Borrower and Guarantor's admissions in their answer; and (c) that the real property taxes remained unpaid despite the tax sales.

37.     SouthPoint eventually filed suit against Origin in this Court for breach of the participation agreement between it and Origin.[3]

**E.     Origin breaches the participation agreements through its failures to provide information, its inexplicable delays, and its eventual course of action.**

38.     Both before and after filing suit against the Borrower and Guarantors, Origin's attempts to enforce the Loan Documents have been woefully and, on information and belief, willfully inadequate. In fact, Origin's actions to date evidence that its primary concern is to delay substantive enforcement against the Guarantors to give them and the Borrower time to sell the Project, as opposed to forcing the Borrower and Guarantors to comply with the Loan Documents and otherwise bring the Loan current, satisfy the unpaid taxes, or otherwise make any payment.

39.     Based on these actions—or lack thereof—it has become evident that Origin is willfully protecting the apparently liquid and solvent Guarantors at the expense of the Participants.

40.     Indeed, it was only after the Participants began pressuring Origin to pursue the Guarantors that Origin belatedly filed suit. And it was not until the Participants pressured Origin to file summary judgment that Origin Bank did so. It was also only after the suggestion of Plaintiffs' counsel that Origin moved for a temporary restraining order to enforce the assignment of rents (which had been all but ignored) and to force the Borrower and Guarantors to pay the past due taxes.

41.     Origin filed its motion for a temporary restraining order on April 7, 2021, followed by its motion for summary judgment on April 19, 2021. But at the hearing on the motion for a

---

[3] That suit is styled as *SouthPoint Bank v. Origin Bank*, Civil Action No. 3:21-cv-00156-TSL-MTP (S.D. Miss.)

temporary restraining order on April 20, 2021, Origin willfully and recklessly entered into an agreement with the Borrower and Guarantors that surrendered any leverage Origin had against them in exchange for little to no benefit to the Participants.

42.     While Origin has failed and refused to provide the details of that agreement to the Participants, the Participants understand that the agreement included the following rough terms:

g.   The Guarantors would redeem the 2018 tax sale but would not pay the past due taxes for 2019 or 2020.[4]

h.   The Borrower would file a chapter 11 bankruptcy in Mississippi instead of in Georgia, as it had allegedly planned to do. That bankruptcy has indeed been filed in the Northern District of Mississippi. Although Origin was aware of the specific date the bankruptcy would be filed, and had been negotiating potential resolutions to the Borrower's intended first-day motions, Origin willfully and in reckless disregard for the Participants' rights failed to notify the Participants of the impending filing or the hearing on the first-day motions, which had been scheduled by the Borrower and Origin without notice to the Participants.

i.   The Borrower would agree to a budget, which according to Origin was never agreed to prior to its bankruptcy filing.

j.   The Guarantors would provide financial information to Origin, which has apparently never been produced.

k.   In return, and without the knowledge or consent of the Participants, Origin apparently agreed to:

---

[4] On information and belief, the Guarantors have in fact paid the 2018 taxes and redeemed the sale.

    i. Indefinitely postpone pursuit of the temporary restraining order against the Guarantors;

    ii. Grant a six-month extension to the Guarantors to respond to the motion for summary judgment, which would have taken the ability to seek a summary judgment off the table because the extension would take the motion beyond the dispositive motion deadline in the case management order; and

    iii. Give the Borrowers and Guarantor's enough time to sell the property out of bankruptcy before it further pursues a judgment against the Guarantors.

43.    There may be other terms of the agreement. But to date, Origin has refused to directly acknowledge that it agreed to anything other than a short postponement of the hearing on the temporary-restraining order and a 30-day extension of the Guarantors' response to the motion for summary judgment. Origin alleges that there is no written agreement, although counsel for the Borrower represented to this very Court in Origin's counsel's presence that there was—or soon would be—a written agreement. *See* Transcript of April 20, 2021 Hearing, attached as Exhibit G.

44.    Counsel to the Participants have repeatedly requested the terms of the agreement between Origin and the Borrower/Guarantors, including all documents or communications evidencing its terms. Indeed, on April 20, 2021, Plaintiffs' counsel demanded by email that Origin provide those terms, advising that any such agreement made without prior notice to or the consent of the Participations violated the 75%-consent provision in section 14 of the participation agreements. *See* Email of April 20, 2021, attached as Exhibit H. Three days later, Origin's counsel fired back an email denying that it had entered into any agreement at the hearing and advising that Origin believed it had retained "all rights" and "discretion" to enforce the Loan Documents, and

that any difference in opinion in how Origin was handling those efforts was merely the Participant's "prerogative." *See* Email of April 23, 2021, attached as part of Exhibit I.

45.     Since that date, Origin has concealed the terms of the agreement from the Participants and has waffled on its position as to whether an agreement was entered into, with Origin most recently taking the position that no "written" agreement existed during a teleconference with the Participants on May 17, 2021. Of course, in a recent filing by the Guarantors in the pending litigation, the Guarantors revealed that an agreement was reached after Origin's summary judgment was filed, as well as an "anticipated" agreement to hold the summary judgment motion in abeyance.[5]

46.     In light of the above and the totality of Origin's acts and omissions that were designed to protect the Guarantors and consequently harmed the Participants, the Participants demanded that Origin step aside as lead under the participation agreements and allow the Participants to jointly select new counsel to enforce the Loan Documents. During a call among Origin, the Participants, and counsel to Origin and the Participants, Origin unreasonably advised that it was willing to step aside only if the Participants would release all claims against Origin, as well as indemnify Origin against any action brought against Origin by the Borrower or Guarantors. This demand was followed up in writing by Origin's counsel on May 24, 2021. *See* Letter of May 24, 2021, attached as Exhibit J.

47.     Based on all of the above, Origin has breached the participation agreements by: (a) prior to default, administering the Loan Documents in bad faith and through willful misconduct and/or gross negligence, and (b) after default, failing to enforce the Loan Documents with the same

---

[5] *See* Doc. 32 ¶¶ 1 and 3, filed in *Origin Bank v. Haven Campus Communities – Starkville, LLC, et al.*, 3:21-cv-00061-TSL-MTP.

duty of care as would reasonably be expected of lenders that are similarly situated to Origin in connection with similar loans. These actions and omissions include the following:

a.  Failing to require the Borrower to right-size the loans in 2018 and 2019;

b.  Failing to require the Borrower to pay the real property taxes in 2018, 2019 and 2020 and failing to require that amounts be escrowed monthly as provided in the Loan Documents;

c.  Recommending the Participants accept the above-noted Loan extension that was extremely favorable to the Guarantors at the Participants' expense;

d.  Slow-walking the collection efforts in the face of constant prodding and outright demands by the Participants, including:

   i.   Taking nearly sixty days to file suit on the debt;

   ii.  Taking no action to foreclose on the collateral;

   iii. Failing to exercise self-help to serve the rents under the assignment of rents;

   iv.  Filing suit on the debt against *both* the Borrower and Guarantors, when the participants requested that only the Guarantors be sued so that a bankruptcy of the Borrower would not delay the case (which bankruptcy *was* filed);

   v.   Initially refusing to quickly file a motion for summary judgment against the Guarantors even though the Guarantors had admitted to owing the debt in their answer so there was no factual dispute;

   vi.  After receiving pressure from the Participants, finally filing the motion for summary judgement, which after only a few days was delayed,

perhaps indefinitely, at the request of the Guarantors' counsel, due to some yet to be fully disclosed agreement;

vii.   Delay in taking judicial action to secure the rents and force the Guarantors to pay the taxes;

viii.   Negotiating away all of Origin's leverage over the Guarantors by giving up the motion for a temporary restraining order to force the Guarantors to pay *all* past due taxes and agreeing to suspend pursuit of the motion for summary judgment against the Guarantors in return for almost nothing other than payment of the long overdue 2018 taxes;

ix.   Agreeing to every extension request of the Guarantors/Borrower to date; and

x.   Failing to take aggressive action in the bankruptcy when it is clear that the borrower's financials do not support the continued ability of the complex to cash flow.

e.  Origin's efforts to conceal its agreements with the Borrower/Guarantors from the Participants.

f.  Origin's refusal to agree to step down from control of the collection efforts in the face of all 95% of the participants requesting it; and

g.  Using the implied threat of giving the Guarantors more extensions unless the participants agree to release Origin from *all* liability during the May 17 phone call and follow-up May 24 letter, noted above.

**F.    Counsel chosen by Origin cannot both represent Origin in its dispute with the Participants and Origin in its capacity as representative of the Participants to collect on the Loan.**

48.     Critically, Origin's counsel Sarah Beth Wilson and Phelps Dunbar LL are operating under a conflict of interest in enforcing the Loan Documents on the Participants' behalf and for their benefit (as required under § 9 of the participation agreements) while also representing Origin adversely against the Participants. This conflict is apparent though Origin's counsel's adverse and hostile communications toward the Participants, including the email of April 23, 2021, and more obviously through Origin's counsel's representation of Origin in the pending litigation between SouthPoint and Origin. It must be removed to avoid irreparable harm to the Participants.

49.     Origin has recently exacerbated the issue. As noted above, Origin and the Participants, as well as the parties' counsel, convened a call on May 17, 2020, during which the Participants demanded that Origin step down as lead bank so the parties could jointly appoint independent counsel to enforce the Loan Documents.

50.     The next week, on May 26, 2021, Origin's Chief Risk Officer Jim Crotwell searched through his old email and forwarded a May 21 announcement he had received from Phelps Dunbar, announcing that Ms. Wilson had been elected Chairman of the Mississippi State Board of Banking Review, an agency overseeing most of the Participants.

51.     Crotwell forwarded that email to Ms. Wilson, congratulating her on the appointment, cryptically cc'ing all the banking representatives of the Participants and their counsel involved in this dispute. *See* Email of May 26, 2021, attached as Exhibit K. The Participants understandably took this email as a threat, furthering continuing and worsening the conflict of interest.

## COUNT ONE:
## BREACH OF CONTRACT

52.     Plaintiffs incorporate all of the above paragraphs as if set forth fully below.

53.     Plaintiffs and Origin are parties to separate participation agreements, which are written and enforceable contracts.

54.     Prior to the Borrower and Guarantors defaulting under the Loan Documents, Origin breached the participation agreements by, among other possible acts or omissions, administering the Loan Documents in bad faith and through willful misconduct and/or gross negligence.

55.     After the Borrower and Guarantors defaulted under the Loan Documents, Origin breached the participation agreements by, among other possible things, failing to enforce the Loan Documents with the same duty of care as would reasonably be expected of lenders that are similarly situated to Origin in connection with similar loans.

56.     In addition, Origin breached the participation agreements by waiving provisions of the Loan Documents and otherwise entering into agreements with the Borrower and Guarantors that required notice to and the consent of the Participants.

57.     As a result, Plaintiffs have suffered, and will continue to suffer, damages in the form of, among other possible damages, monetary losses and attorney's fees and expenses, which are recoverable under Section 25 of the participation agreements.

## COUNT TWO:
## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

58.     Plaintiffs incorporate all of the above paragraphs as if set forth fully below.

59.     Plaintiffs and Origin are parties to separate participation agreements, which are written and enforceable contracts.

60.     Under Mississippi law, which governs the participation agreements, every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

61.     For the reasons set out above, Origin has breached the duty of good faith and fair dealing implicit in the participation agreements, including by failing to administer and enforce the Loan Documents for the benefit of the Participants and instead favoring and protecting itself, the Borrower, and Guarantors.

62.     As a result, Plaintiffs have suffered, and will continue to suffer, damages in the form of, among other possible damages, monetary losses and attorney's fees and expenses, which are recoverable under Section 25 of the participation agreements.

### COUNT THREE:
### NEGLIGENCE AND WILLFUL MISCONDUCT/GROSS NEGLIGENCE

63.     Plaintiffs incorporate all of the above paragraphs as if set forth fully below.

64.     Under the participation agreements, Origin owes Plaintiffs a duty of care to: (a) prior to default, administer the Loan Documents without bad faith, willful misconduct, and/or gross negligence, and (b) after default, enforce the Loan Documents with the same duty of care as would reasonably be expected of lenders that are similarly situated to Origin in connection with similar loans.

65.     For all the reasons set out above, Origin has breached those duties to Plaintiffs.

66.     As a direct and proximate cause of Origin's breach, Plaintiffs have suffered, and will continue to suffer, damages.

67.     In addition, Origin's breach of those duties constituted willful misconduct, gross negligence, and/or bad faith. Accordingly, Origin is liable to Plaintiffs for extracontractual and punitive damages, including attorney's fees and expenses.

### COUNT FOUR:
### TEMPORARY RESTRAINING ORDER,
### PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION

68.     Plaintiffs incorporate all of the above paragraphs as if set forth fully below.

69.     Plaintiffs request that this Court enter a temporary restraining order, preliminary injunction, and permanent injunction under Rule 65 of the Federal Rules of Civil Procedure, removing Origin as lead under the participation agreements and allowing the Participants and Origin to jointly select counsel of their choosing to enforce the Loan Documents against the Borrower and Guarantors.

70.     Under F.R.C.P. 65, the Court may issue a temporary restraining order, preliminary injunction, and permanent injunction if Plaintiffs show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest.  Fed. R. Civ. P. 65; *see Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *see also Trinity USA Operating, LLC v. Barker*, 844 F. Supp. 2d 781, 785 (S.D. Miss. July 21, 2011).

71.     There is a substantial likelihood that Plaintiffs will prevail on the merits. For the reasons above, Origin has breached the participation agreements and continues to breach those agreements on an ongoing basis.

72.     Due to the nature of Origin's breaches, Plaintiffs will be irreparably harmed if an injunction is not granted, including the following:

    a.  The real and imminent possibility that Origin may enter into *further* agreements with the Borrower and Guarantors without notice or approval of the Participants in violation of the participation agreements.

    b.  The unquantifiable damage and harm to the Participants who, as regulated entities, must report non-performing loans. The existence of this non-performing Loan and

Origin's delay in its collection efforts limits the Participants' ability to make other loans and subjects them to further regulatory restriction and scrutiny.

c. Origin's counsel is currently attempting to enforce the loans for the Participants' benefit while representing Origin adversely against the Participants, including in the litigation between SouthPoint and Origin and, presumably, this very case. Indeed, it is clear that Origin and its counsel are out to protect only their own interests at the Participants' expense. Origin has even recently threatened and touted its counsel's position as chairman of the very regulatory board overseeing all but one of the Participants.

There is no adequate remedy at law to compensate this harm, and an injunction is therefore warranted.

73. The threatened injury to Plaintiffs if an injunction is denied outweighs any harm to Origin if the injunction is granted. If the injunction is granted, Origin need only step aside and allow the Participants to jointly select counsel to enforce the Loan Documents in Origin's place. But if the injunction is denied, Plaintiffs will suffer irremediable damage and will incur substantial losses.

74. It will not disserve the public interest if an injunction is granted. To the contrary, an injunction would serve the public interest by protecting the rights and interests of the parties and by fostering the strong public interest in requiring parties to a contract to honor their agreement.

75. For these reasons, Plaintiffs are entitled to a temporary restraining order, preliminary injunction, and permanent injunction against Origin, removing them as lead bank under the Participation Agreements and allowing the Participants to jointly select new counsel to enforce the Loan Documents.

**WHEREFORE**, Plaintiffs request that this Court:

A.      Enter judgment in Plaintiffs' favor and against Origin for all damages resulting from its respective (i) breaches of the participation agreements, (ii) breaches of the duty of good faith and fair dealing, and (iii) negligence and/or willful misconduct/gross negligence, including for all monetary losses, attorney's fees and expenses, punitive damages, and all other damages in an amount to be shown at a hearing or trial, plus prejudgment interest, postjudgment interest, and costs.

B.      Enter a temporary restraining order, preliminary injunction, and permanent injunction, removing Origin as the lead bank under the participation agreements and allowing the Participants to jointly select new counsel to enforce the Loan Documents.

Dated: June 3, 2021.

PLANTERS BANK & TRUST COMPANY; AND
PEOPLES BANCSHARES, INC. D/B/A PEOPLES BANK

By:   /s/ William C. Brabec
      William C. Brabec (MSB No. 4240)
      Timothy J. Anzenberger (MSB No. 103854)
      ADAMS AND REESE LLP
      1018 Highland Colony Parkway, Suite 800
      Ridgeland, MS 39157
      Telephone:    601.353.3234
      Facsimile:    601.355.9708
      bill.brabec@arlaw.com
      tim.anzenberger@arlaw.com

## VERIFICATION

STATE OF MISSISSIPPI
COUNTY OF SIMPSON

Personally appeared before me, the undersigned authority in and for the said county and state, on this _3rd_ day of _June_, 2021, within my jurisdiction, the within named Dennis Ammann, who acknowledged that he is the President and Chief Executive Officer of Peoples Bancshares, Inc., a Mississippi banking corporation, and that for and on behalf of the said bank, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said bank to do, and that the facts stated in this Verified Complaint are true and correct to the best of his knowledge, information, and belief.

DENNIS AMMANN

SWORN TO AND SUBSCRIBED BEFORE ME, this the _3rd_ day of _June_, 2021.

Notary Public

My commission expires: _3-22-2024_

(SEAL)

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 115759
EMILY WARREN
Commission Expires
March 22, 2024
SIMPSON COUNTY